CALLAWAY *v.* PERDUE.

5-3374                                      385 S. W. 2d 4

Opinion delivered November 23, 1964.

[Rehearing denied January 11, 1965.]

*William H. Drew,* for appellant.

*Switzer & Griffin,* for appellee.

CARLETON HARRIS, Chief Justice. In September, 1944, P. L. Callaway and his wife, Irene, conveyed 320 acres of land to their grandson, Logan Lee Perdue, age one and one-half years. In April, 1955, Mrs. Callaway was appointed guardian of the person and estate of the minor. In February, 1963, Mrs. Callaway died.

In April, 1963, Logan Lee Perdue, then twenty years of age, whose disabilities as a minor had been previously removed,[1] instituted suit against his grandfather and H. A. Etheridge, alleging that these individuals had, in 1953, cut and removed timber growing on the lands (which had been deeded to him by his grandparents) of the value of $5,376.00, ''and did convert and dispose of same to their own use. * * *'' Callaway filed a general denial, and Etheridge answered, admitting purchasing and removing timber from the lands in question, but asserting that he contracted with Callaway for such purchase and removal. The case proceeded to trial, but at the conclusion of the presentation of the evidence, appellee took a non-suit as to defendant Etheridge. The jury returned a verdict against Callaway in the amount of $13,382.40, representing treble damages for the value of the timber taken. From the judgment so entered by the court, comes this appeal. Appellant sets out seven points for reversal, which we proceed to discuss.

---

[1] The order removing disabilities does not appear in the record, but Perdue testified that this had been done, and no question was raised by appellant in the trial court.

It is first asserted that the action against appellant is "barred by the Statute of Frauds." We do not see that the Statute of Frauds has any application in this case whatsoever. Appellee's case is predicated upon the fact that Etheridge purchased the timber from Callaway, and had same cut and removed; that Callaway had no right to sell the timber, and wrongfully disposed of it. There was no written contract, but the Statute of Frauds, if applicable at all, could only relate to the transaction between Callaway and Etheridge, and certainly has nothing to do with the rights of the true owner of the property. According to Perdue's allegations, Callaway and Etheridge, respectively, wrongfully sold, and purchased, appellee's timber, and converted the proceeds to their own use.

It is next asserted that the proof is insufficient to support the verdict. It is true that the evidence is rather meager. The principal testimony connecting Callaway with the transaction is that of defendant Etheridge who testified that Callaway told him (Etheridge) that he wanted to sell some timber on his land, and Etheridge was to stop by the Callaway home and advise Mrs. Callaway whether he was interested in purchasing same. Etheridge, who was engaged in buying and selling timber for Bradley Lumber Company, left word with Mrs. Callaway that he would be glad to handle it. According to Etheridge, Mrs. Callaway told him to go ahead and cut the timber. The witness stated that all of his negotiations were carried on with the wife, and after cutting the timber, he paid Mrs. Callaway. Subsequently, however, he met Mr. Callaway, and the latter told him that he had made a $20.00 mistake in the amount paid Mrs. Callaway, and Etheridge thereupon paid appellant an additional $20.00. Logan Lee Perdue, appellee, testified that his grandfather told him that he had cut the timber, and Homer Perdue, father of appellee, likewise testified that Callaway had told him ten or twelve years back that "he had cut and sold Logan Lee's timber." The witness stated that he went to the land belonging to his son, and observed that the timber has been cut; that no money

was turned over to him. Accordingly, the only evidence that appellant participated in the trespass and conversion was the statements of Etheridge that he had been approached by Callaway relative to the sale, and had paid $20.00 extra to appellant; the statement of appellee that his grandfather had told him that he (the grandfather) had sold the timber, and third, the evidence of Homer Perdue, father of appellee, that P. L. Callaway had made the same statement to him.[2]

The aforementioned evidence, though scanty, was, we think, sufficient to take the case to the jury.

Appellant contends that, even if there is sufficient evidence to present a jury question, the amount determined by the jury is excessive because treble damages were awarded.[3] This argument is based on the contention that the pertinent statutory provision (Ark. Stat. Ann. § 37-204 [1947]) requires that actions for penalty be commenced within two years. The entire section reads as follows:

"Actions for recovery of statutory penalty—Two years.—All actions on penal statutes, where the penalty, or any part thereof, goes to the State, or any county or person suing for the same, shall be commenced within two [2] years after the offense shall have been committed, or the cause of action shall have accrued."

Section 37-226 is relied upon by appellee as tolling Section 37-204 under the facts of this case, and permitting his recovery of treble damages. That section reads as follows:

"If any person entitled to bring any action, under any law of this state, be, at the time of the accrual of the

_____

[2] The record does not reflect the reason for the failure of Homer Perdue to take some action on behalf of his son at the time of learning that the timber had been cut and removed.

[3] Ark. Stat. Ann. § 50-105 (1947) provides, "If any person shall cut down, injure, destroy or carry away any tree placed or growing for use or shade, or any timber, rails or wood, standing, being or growing on the land of another person, * * * in which he has no interest or right, standing or being on any land not his own, * * * every person so trespassing shall pay the party injured treble the value * * * with costs."

cause of action, under twenty-one [21] years of age, or insane or imprisoned beyond the limits of the state, such person shall be at liberty to bring such action within three [3] years next after full age, or such disability may be removed.''

We think this last statute is controlling. In the early case of *Nebraska National Bank* v. *Walsh,* 68 Ark. 433, 59 S. W. 952, this court construed Section 4826 of Sandels and Hill Digest, that section being absolutely identical to Section 37-204, heretofore quoted, and held contrary to appellant's contention.

For the fourth point for reversal, it is argued that the trial court erred in not allowing a continuance because of the illness of the appellant, and in refusing to allow certain interrogatories, propounded to him, together with answers, to be read to the jury. We find no merit in this contention, and actually the point may be peremptorily disposed of because of the fact that the record does not reflect that any motion for a continuance was made at the time of trial. However, inasmuch as this case is going to be reversed on a subsequent point, the question may well arise again as to whether the interrogatories can properly be used, particularly in view of the fact that appellant has apparently died since the judgment was rendered. Although no Order of Revivor appears in the record, appellant evidently is now deceased, since the transcript reveals a motion by ''Don F. Callaway, Executor, of the Estate of P. L. Callaway, Deceased,'' through his attorney, for an extension of time in which to file this appeal.[4]

On October 21, 1963, appellee served notice on appellant for the taking of the discovery deposition of Callaway on November 15, 1963. Counsel then filed his motion, seeking to prohibit appellee from taking this deposition, setting out that Callaway was a patient in the Lake Village Infirmary, and previously had been confined to his bed at his home for more than eight

---

[4] While the cause was likely revived in the name of the executor, no order appearing, we have continued to refer to P. L. Callaway as "appellant."

months. An affidavit was executed by Dr. Alan G. Talbot, enumerating the ailments of Callaway, and further stating:

"* * * It is further the opinion of this attending physician that to subject the patient to interrogation by reason of his illnesses as heretofore set out, will be detrimental to the patient in aggravating his physical condition. That such interrogation would not only aggravate his physical condition but would probably create such a state of tension that he may suffer serious relapses and actual danger to his life."

The record does not reflect what action, if any, was taken by the court. The trial of the case was held on November 20, 1963, but as previously stated, no request for continuance appears in the transcript. However, prior to the notice of the taking of depositions, appellee had, on August 5, 1963, propounded to appellant certain interrogatories, and these were answered on August 16, 1963. At the trial, counsel for Callaway offered into evidence the interrogatories and answers thereto, contending that he was entitled to do so, and stating:

"* * * It is a matter of public knowledge that the Defendant, P. L. Callaway, has been confined in bed for more than eight months and is currently confined in the Lake Village Infirmary suffering from maladies, as shown by the affidavit of the doctor, duly filed herein, and that he is physically unable to even sit, much less come to this courtroom."

The assertion that the interrogatories and answers were admissible is based on Ark. Stat. Ann. § 28-355 (Repl. 1962) which first makes provision for the service of written interrogatories upon any party by an adverse party, and then reads as follows:

"Interrogatories may relate to any matters which can be inquired into under Section 1 (b) [§ 28-348, subsec. (b)], and the answers may be used to the same extent as provided in Section 1 (d) [§ 28-348, subsec. (d)] for the use of the deposition of a party."

It will be noted that the quoted provision refers back to Section 28-348, Subsection (d), which reads as follows:

"At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice thereof, in accordance with any one of the following provisions: * * *

"(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: 1, that the witness is dead; or 2, that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; or 3, that the witness is unable to attend or testify because of age, sickness, infirmity, or imprisonment; * * *"

Careful research reveals that counsel is in error in his contention, and he is not entitled to use these interrogatories. Section 28-348 (d) is an exact copy of Rule 26 (d), Federal Rules of Civil Procedure, and the quoted portion of Section 28-355 is identical with the corresponding portion of Rule 33. Federal cases do not sustain appellant's position, and the answers to interrogatories are generally held inadmissible, if offered on behalf of the party making answer, as "self-serving declarations." In *Haskell Plumbing and Heating Company* v. *Weeks, et al.* 237 F. 2d 263, the Circuit Court of Appeals for the Ninth Circuit stated:

"It seems clear that the trial court was in error in permitting these answers, which were self-serving, to be introduced on behalf of the plaintiffs and that this error was compounded by refusal to permit the plaintiffs to be cross-examined upon the question of the amount of their losses. It is true that Rule 26 (d) permits the use of depositions or portions thereof, but only 'so far as admissible under the rules of evidence.' The rules of evi-

dence would permit answers such as these to be used against the party giving them, but because they are self-serving they should not have been admitted on behalf of these plaintiffs.''

See also *Bailey* v. *New England Mutual Life Ins. Co. of Boston, Mass.,* 1 FRD 494; *United States* v. *Smith,* 95 F. Supp. 622; *Stottlemire* v. *Cawood,* 213 F. Supp. 879; *Coca Cola Co.* v. *Dixi-Cola Laboratories,* 30 F. Supp. 275. One of the principal reasons for not allowing the use of the interrogatories on behalf of the answering party is the fact that there is no opportunity for cross-examination. In reviewing various cases, one exception to the non-admissibility of interrogatories is noted, *viz,* where the adverse party offers part of the answers to the interrogatories, the person making answer is entitled to read any other answer which tends to explain or correct the answers offered by the adverse party. No cases involving the death of a party who had previously answered interrogatories have been found, but Moore, in Volume 4, (2d Ed.) Federal Practice, Page 2343, gives a hypothetical case which seems to cover the point at issue. The illustration given, with the names of the parties here inserted in parenthesis, is as follows:

''Suppose that in response to P's (Perdue's) interrogatories D (P. L. Callaway) served answers, then died and his personal representative, X (Don Callaway, Administrator of the Estate, hereinafter called Don) was substituted. To the extent that D's (P. L. Callaway's) answers contained admissible evidence, such as admissions, P (Perdue) could use them either under Rule 26 (d) (2) or (d) (3). But X (Don), despite Rule 26 (d) (3), should not be able to use material in the answers favorable to X's (Don's) case or defense, since D's (P. L. Callaway's) answers, although under oath, were not subject to cross-examination by P (Perdue), and hence are not admissible in evidence against P (Perdue).''

It is asserted that the trial court erred in excluding from the evidence letters of guardianship issued to Irene Gordon Callaway (wife of P. L. Callaway) as guardian

of the person and estate of appellee. We find no merit in this contention. In the first place, the timber was cut in 1953, and the letters of guardianship (which although not admitted into evidence, are in the record) were issued in April, 1955, and it is difficult to understand from the argument the purpose appellant had in mind in tendering the exhibit for introduction. Of course, the letters do not show whether the money received from the timber sale was placed in the guardianship account, and no effort was made to introduce any annual accountings that might have been filed by the guardian. At any rate, under the proof in the present record, we are unable to determine the pertinency of the proffered exhibit.

Appellant contends that a mistrial should have been declared by the court. The suit was originally commenced against both Callaway and Etheridge, and Etheridge had employed one Ellis Coulter to cut the timber on the 320 acres here involved. Coulter, while testifying concerning his employment, made certain statements which were admissible as to Etheridge, by virtue of the fact that Etheridge was a defendant. However, at the conclusion of all the evidence, appellee took a non-suit as to this defendant, and appellant asserts that this action was prejudicial to him. The motion for a mistrial was alternative motion, the first motion being a request for a directed verdict. Though some testimony by Coulter (quoting Etheridge as to the amount that defendant had paid Callaway for the timber) was hearsay evidence as to Callaway, counsel did not ask the court to apprise the jury that the testimony of Coulter was not admissible against Callaway, nor was there any request for an instruction to this effect. We find no error under this point.

Also, while on the stand, Coulter stated that he had noted in a memorandum book the number of feet of timber which had been cut, and the price he received per thousand. The witness testified that the notations referred to were placed in a book at the time of the cutting, but the book that he referred to while testifying was not the 1953 book.

"I had a memorandum book, which I carried in my pickup and in some way they rolled it around and dropped it and there was oil from the saw and different things and some of it got on this book, I transferred this stuff onto this 1956 book."

The introduction of this last book was objected to by appellant, and the court stated:

"I want this witness to find his record book; however, if he can't find the book this was transferred from, I will allow it to be used in evidence."

Coulter subsequently testified that he could not find the original record book, but the second book does not appear in the transcript. At any rate, appellant does not designate the introduction of the exhibit as one of his points of error, and we do not pass on it.

Finally, it is contended that certain instructions were erroneous, and we agree that the giving of Instruction No. 4 constituted reversible error. The jury was instructed:

"If you find the issues in favor of Logan Lee Perdue, you will award him such sum as you find will be equal to 3 times the value (at the stump) of the timber so damaged, broken, destroyed or carried away."

The court had previously quoted the statute on single damages (Ark. Stat. Ann. § 50-107 [1947]), but it will be noted that the questioned instruction positively directs the jury to grant treble damages if they find for appellee. It is our opinion that, under the proof in this case, a jury question was presented as to whether appellant was liable for single or treble damages.

It is true that our statute relative to treble damages (the pertinent parts of which have already been quoted in Footnote 3) does not actually use any words which require the trespasser to hold an evil intent or act in bad faith before being liable for the penalty. Yet, our cases make clear that a necessary element to justify treble damages is intent of wrongdoing, though such intent may

be inferred from the carelessness, recklessness, or negligence of the offending party. In *Laser* v. *Jones*, 116 Ark. 206, this court had occasion to interpret Section 7976 of Kirby's Digest, which reads identically with Section 50-105 of the present statute. There, in an opinion by the late beloved Justice Frank G. Smith, this court said:

"It is, therefore, proper to consider the use which may be, and is, made of the tree, and if the tree adds to the value of the land, while its destruction detracts from its value, then this difference in value is the measure of the recovery, even against one who, without malice, destroys it. But, if the tree was *maliciously*[5] destroyed, the damages recoverable are treble this value."

In *Fogel* v. *Butler,* 96 Ark. 87, it was said:

"It will be observed that the instruction as given by the court told the jury that if they found that the defendant cut the timber without authority and knowingly, the jury should allow three times the value of the timber. Now, it is manifest that the court meant, and that the jury understood, that, before treble damages should be given, the jury must find not only that the defendants had no authority to cut the timber, but that they knew they had no such authority."

In *Floyd* v. *Richmond,* 211 Ark. 177, 199 S. W. 2d 754, we stated:

"Appellant next contends 'that there was nothing in the record whatever to warrant the submission to jury of the question of punitive damages, and that in so doing the learned trial court gravely prejudiced this appellant and committed reversible error.' We think this contention untenable for the reason that, as has been indicated, there was evidence from which the jury might have found that there was an element of willfulness in appellant's action in severing the trees and this warranted instructions on this issue."

See also *Case* v. *Hunt,* 217 Ark. 929, 234 S. W. 2d 197, where we said:

---

[5] Our emphasis.

"Our statutes do not impose double or treble damages upon one who cuts timber from the land of another unless he does so wilfully and intentionally."

Also see *Freeze* v. *Hinkle,* 229 Ark. 714, 317 S. W. 2d 817.

It is apparent from these citations that treble damages are only invoked where one cuts timber with the intention of depriving the true owner of the value thereof. We do not think that one acting in good faith is liable for treble damages.

The circumstances in the instant case appear to be most unusual, and a study of the testimony leaves several questions unanswered. It will be recalled that the particular property in question was deeded to appellee by the grandfather (who is the defendant in this case), and the grandmother (who subsequently was appointed guardian). There is no explanation as to why the grandmother, rather than the child's father or mother, was appointed guardian, nor can the answer be found in the record as to why the grandparents deeded the property to the one and one-half year old grandchild. But unless they were endeavoring to defraud creditors (of which there is not the slightest indication in the record), their motive would appear to have been a good one, based on the love and affection for this child.

The record reveals the following testimony of Logan Lee Perdue, appellee herein, during his examination by counsel:

"Q. Now will you state to this Jury when you first can recall owning this property, the deed of which has been entered in the record, which was just when you were a very small child. Do you remember when you first recall owning this property?

A. The first time that I can recall was during high school, when I was in the 10th and 11th grades.

Q. Did you ever have an opportunity to speak with the Defendant, Mr. Callaway, concerning this property?

A. Yes, I did.

Q. Will you state to the Jury what your conversation with Mr. Callaway consisted of?

A. I recall that during high school, when I started to make my decision to attend college, I went to see my grandparents and he told me that 'I cut your timber and I have enough money for you to attend college and a little left over.' * * *

Q. Where were you?

A. We were in the bedroom at his home.

Q. What grade were you in then?

A. I do not recall exactly—10th or 11th grade.

Q. How old would you have been then?

A. I would say 15 or 16.

Q. Sir, since that time have you finished high school?

A. Yes.

Q. Have you gone to college?

A. Yes.

Q. When did you go to college?

A. I went to college in 1960.

Q. Where did you go?

A. I went to Ouachita.

Q. How long did you go to Ouachita?

A. I went to Ouachita a year."

Subsequently, Perdue testified that he attended Ouachita for two semesters, but only finished one; that he received money from his grandfather during both semesters, and that in the spring semester of 1962, he attended Southern State; that he also received money from his grandfather at that time, and that the grandfather offered to send money during the summer se-

mester, but that he did not take it. He also testified that his grandmother sent him money about once a month. Appellee testified that this money did not come from the timber sale, but rather, was derived from bonds which had been purchased by his parents, but were in the possession of his grandfather. When asked how he knew where the money came from, he replied, "I do not know definitely, but merely what my mother and father have told me." He testified that these bonds were in his name, and that of the grandfather. There is no explanation of why bonds, purchased by the parents, were in possession of the grandfather, and bearing the grandfather's name. The father, Homer Perdue, stated that he and his wife. had bought some "very small" bonds, and had given them to the boy, leaving them in Callaway's safe deposit box. He also stated that he and Callaway had purchased $1,000.00 in bonds for the boy "from some profits from a cattle deal. * * *"

We think the circumstances set out made a jury question of whether Callaway had acted wrongfully. Why did the grandparents deed the property to the boy if they intended to reap any personal benefits from the lands or timber? Certainly, if the grandfather had intended to commit a wrongful act, he would not have told his grandson that he had sold the timber, and that there should be enough for college with "a little left over." Apparently the grandson "fell out" with his grandfather since he testified that he tore up a check that had been given to him by the latter.

Under the instruction in question, the jury was given no opportunity to find that Callaway acted in good faith, and we think that this was reversible error. The finding that this instruction was erroneous means also that Instruction No. 2 will have to be reworded.

Reversed and remanded.